# Supreme Court of Florida

---

No. SC18-149

---

**THE FLORIDA BAR,**
Complainant,

vs.

**TIKD SERVICES LLC, A FOREIGN LIMITED LIABILITY COMPANY, and CHRISTOPHER RILEY, INDIVIDUALLY AND AS FOUNDER OF TIKD SERVICES, LLC,**
Respondents.

October 14, 2021

LAWSON, J.

We have for review a referee's report on the petition of The Florida Bar (Bar) to enjoin respondents, TIKD Services, LLC and Christopher Riley (collectively TIKD), from engaging in the unauthorized practice of law. The referee recommends that we dismiss the Bar's petition with prejudice. We have jurisdiction. *See* art. V, § 15, Fla. Const.; *see also* R. Regulating Fla. Bar 10-7.1. For the reasons that follow, we disapprove the referee's recommendation, conclude that TIKD is engaged in the

unauthorized practice of law, and permanently enjoin it from engaging in such acts in the future.

## BACKGROUND

In January 2018, the Bar filed a two-count petition against TIKD alleging that it engaged in the unauthorized practice of law, and that it held itself out to the public via its website and advertisements as qualified to provide legal services. A referee was appointed to consider the petition, as well as several motions filed by the parties. The referee granted summary judgment in favor of TIKD and submitted a report with the following findings and recommendations.

TIKD Services, LLC is not a law firm, and its chief executive officer, Christopher Riley, is not a member of the Bar. TIKD operates a website and mobile application through which a driver can receive legal assistance in the resolution of a traffic ticket. A driver who receives a traffic ticket in one of the four counties in which TIKD operates can request services by creating an account with TIKD via its website, agreeing to its Terms of Service, and uploading a picture of his or her traffic ticket. TIKD then analyzes the ticket to determine whether it should provide any services to the

driver. If TIKD declines the ticket, the driver is notified, and he or she is not charged a fee. If TIKD accepts a ticket, the driver is charged a percentage of the ticket's face value, and his or her contact information is forwarded to a Florida-licensed attorney whom TIKD has contracted with to provide traffic ticket defense services to its customers. All costs associated with defending the traffic ticket are paid by TIKD, including any court costs or assessed fines. TIKD does not guarantee that a driver's case will be resolved favorably and provides a full refund if points are ultimately assessed against a driver's license.

A driver who agrees to TIKD's Terms of Service specifically authorizes it to do the following:

> **Representation.** By using the TIKD Properties and purchasing the Services, you authorize us to hire an independent licensed attorney on your behalf to represent you on all matters concerning the license plate number and traffic ticket number submitted by you with the TIKD Properties and to make payments to such independent licensed attorney on your behalf.

The attorneys TIKD contracts with are paid a flat rate per case, regardless of the case's outcome. The fee paid to each attorney is set by TIKD and is paid from the fee it collects from each driver. Each attorney is free to accept or decline representation of any

driver, and drivers are likewise free to accept or decline representation from any attorney. If representation is accepted, the attorney communicates directly with the driver and handles all aspects of his or her ticket defense case.

On these facts, the referee determined that TIKD is not engaged in the unauthorized practice of law, and that it does not advertise in a way that would lead a reasonable person to believe it is offering legal services to the public. The referee found that TIKD provides only administrative and financial services, and that its payment of attorney's fees on behalf of drivers did not convert its services into the practice of law, given that rules 4-1.8(f) and 4-5.4(d) of the Rules Regulating the Florida Bar (Bar Rules) authorize third-party payment of attorney's fees. She further found that all legal services were provided by Florida-licensed attorneys, and that there was no evidence TIKD's services place the public at risk of being advised or represented by unqualified persons in legal matters. The referee ultimately recommended that a judgment be entered in favor of TIKD and that the Bar's petition be dismissed with prejudice.

The Bar, consistent with Bar Rule 10-7.1(f), filed an objection to the referee's report, challenging the conclusion that TIKD is not engaged in the unauthorized practice of law. TIKD filed a response to the objection, and two amicus briefs were filed; one in support of the Bar from a group of private practice lawyers, collectively referred to as "Florida Private Practice Lawyers," and another in support of TIKD from Consumers for a Responsive Legal System (Responsive Law) and the Center for Public Interest Law.

## ANALYSIS

In this case, the referee granted summary judgment in favor of TIKD, concluding that no material facts were in dispute and that TIKD was not engaged in the unauthorized practice of law. This Court reviews a referee's entry of summary judgment de novo. *Fla. Bar v. Gold*, 937 So. 2d 652, 655 (Fla. 2006); *Fla. Bar v. Rapoport*, 845 So. 2d 874, 877 (Fla. 2003). We agree that no material facts are in dispute in this case. From our review of the record, it is abundantly clear how TIKD operates, the nature of the services it provides, and the content of its advertisements. The only question before this Court is thus whether TIKD, as a matter of law, is engaged in the unauthorized practice of law.

Under article V, section 15 of the Florida Constitution, this Court has the authority to "regulate the admission of persons to the practice of law and the discipline of persons admitted." Included within this constitutional mandate is the authority to define what constitutes the practice of law, as well as the authority to regulate the activities of persons admitted or authorized to so practice. *See Fla. Bar v. Moses*, 380 So. 2d 412, 417 (Fla. 1980); *State ex rel. Fla. Bar v. Sperry*, 140 So. 2d 587, 588 (Fla. 1962), *vacated on other grounds by* 373 U.S. 379 (1963). Also included is the authority to prohibit unlicensed persons from engaging in acts constituting the practice of law. *Moses*, 380 So. 2d at 417.

In defining the practice of law, we have resisted attempts to formulate a singular, all-encompassing definition, as the practice itself "must necessarily change with the everchanging business and social order." *Fla. Bar re Advisory Opinion—Medicaid Planning Activities by Nonlawyers*, 183 So. 3d 276, 285 (Fla. 2015) (quoting *Fla. Bar v. Brumbaugh*, 355 So. 2d 1186, 1191-92 (Fla. 1978)). Nevertheless, in assessing whether certain acts constitute the practice of law, we generally consider the following:

> [I]n determining whether the giving of advice and counsel and the performance of services in legal matters for compensation constitute the practice of law it is safe to follow the rule that if the giving of such advice and performance of such services affect important rights of a person under the law, and if the reasonable protection of the rights and property of those advised and served requires that the persons giving such advice possess legal skill and a knowledge of the law greater than that possessed by the average citizen, then the giving of such advice and the performance of such services by one for another as a course of conduct constitute the practice of law.

*Sperry*, 140 So. 2d at 591.

The referee in this case did not apply the above factors in determining that TIKD was not engaged in the unauthorized practice of law. She instead primarily relied on her finding that TIKD provides only administrative and financial services, and that it delegates all substantive legal matters to Florida-licensed attorneys. Having considered the *Sperry* factors, however, we conclude that they support a finding that TIKD is engaged in the unauthorized practice of law.

First, the services TIKD provides have the potential to substantially affect whether a driver timely receives legal representation and the quality of the representation he or she receives. The ability to timely obtain quality representation in a

traffic citation matter, as well as the satisfaction of all assessed fines and costs, has the potential to substantially affect a driver's rights under the law, such as whether he or she retains the privilege of driving or has points assessed against his or her license. *See id.* at 591; *see also* §§ 318.15 (Failure to Comply with Civil Penalty or to Appear; Penalty), 322.27 (Authority of Department to Suspend or Revoke Driver License or Identification Card), Fla. Stat. (2020).

TIKD advertises the legal services that are at the core of its business model directly to the public and thereby directly solicits drivers with legal problems. When a driver engages its services, TIKD conducts a business review of his or her legal matter to determine whether it can profitably handle the case (with profitability as the only apparent criterion considered). It then either rejects the representation or sends the case to one of the lawyers it contracts with. TIKD could routinely miss critical deadlines that substantially impair the legal rights of its clients. It could also fail in its contractual obligation to pay fines owed, resulting in a client's loss of driving privileges or other legal sanctions. However, because TIKD is not a lawyer, this Court

would be powerless to act for the protection of the public.  *See* art. V, § 15, Fla. Const.[1]

Second, TIKD collects money from its legal clients and promises to use that money to pay any court costs or fines that the legal client incurs as a result of the traffic citation.  If a lawyer took up-front money from a client to satisfy monetary obligations anticipated to be incurred at the conclusion of a legal proceeding, the lawyer would be required to hold that money in trust for the benefit of the client.  R. Regulating Fla. Bar 5-1.1(a).  Because TIKD is not a law firm, there are no protections in place to safeguard the money of these legal clients and thereby assure that the money is actually available to satisfy the future legal obligations associated with the legal matter.

Third, an inherent conflict and corresponding risk to the public arises whenever a nonlawyer like TIKD controls and derives its income from the provision of legal services.  Like any other

---

1.  The fact that TIKD apparently does not routinely miss legal deadlines is of no consequence because the precedent we would set by allowing this nonlawyer entity to directly advertise legal services and accept legal clients would necessarily open the door for any nonlawyer to similarly control the provision of legal services in the same way—and with no oversight from this Court.

business entity, TIKD is motivated by a desire to maintain and increase profitability. When coupled with the provision of legal services to the public, there is a risk that such motives will eventually give rise to a conflict between the profit demands of the nonlawyer and the professional obligations of attorneys to act in the interests of a client. *See* R. Regulating Fla. Bar 4-1.7(a)(2). TIKD is not subject to the Bar's jurisdiction and, other than Bar discipline proceedings against individual attorneys, there is no means by which to protect the public or guard against such conflicts.

Fourth, as a nonlawyer, TIKD simply lacks the skill or training to ensure the quality of the legal services provided to the public through the licensed attorneys it contracts with, nor does it possess the ability to ensure compliance with the Rules of Professional Conduct or to otherwise guard against the type of conflict discussed above. By contrast, if this were a law firm, its owners would be ethically required to properly supervise any less-experienced lawyers to whom they assigned a legal matter, *see* R. Regulating Fla. Bar 4-5.1(a)-(b), and those owners would possess the legal training that would prepare them for that supervision. Nowhere is TIKD's lack of skill or training in the legal profession more evident

than in its advertisements, which include statements such as, "TIKD provides you with a more convenient, more cost-effective alternative to hiring your own lawyer or using a lawyer referral service." Such advertisements are likely to lead a reasonable person to believe that utilizing TIKD's services is equivalent to or a substitute for hiring an attorney. *See, e.g.*, *Fla. Bar v. Becerra*, 661 So. 2d 299, 300 (Fla. 1995) (enjoining respondent from advertising in a manner that may lead a reasonable person to believe that she is capable of providing legal services). In the end, the reasonable protection of a driver's legal rights and interests in a traffic citation matter require that the type of services TIKD provides and advertises to the public be performed or overseen by a person who possesses a knowledge and skill in the law greater than that possessed by the average citizen. *See Sperry*, 140 So. 2d at 591.

The referee also failed to cite any cases or rules authorizing a comparable bifurcation of responsibilities between lawyers and nonlawyers with respect to the provision of legal services. A review of our case law reveals that we have unanimously determined similar arrangements to constitute the unauthorized practice of law, particularly when the arrangement resulted in a nonlawyer

- 11 -

either deriving income from or exercising a degree of control over the provision of legal services.

In *Florida Bar v. Consolidated Business & Legal Forms, Inc.*, 386 So. 2d 797 (Fla. 1980), we adopted a referee's recommendation to enjoin a corporation operated by nonlawyers from offering legal services to the public through licensed attorneys in its employ. *Id.* at 798-801. The referee in the case found that the respondent improperly exercised a degree of control over the legal services provided by the attorneys in its employ by engaging in acts typically reserved to those licensed to practice law. *Id.* at 799. Specifically, the referee found that the respondent controlled which legal services were offered, determined on what matters attorney time was spent, set and collected fees for legal services, and established policies for the advance payment of fees and costs. *Id.*

The referee in *Consolidated Business* ultimately concluded, however, that even if the respondent somehow changed its business practices to no longer exercise a degree of control over the attorneys in its employ and the provision of legal services, its inability to generate income from means other than the provision of legal

services was dispositive of whether it was engaged in the

unauthorized practice of law. *Id.* The referee explained:

> Assuming that these practices could be corrected by the respondent, would the respondent then be free of the charge of unauthorized practice? It is the finding of this Referee that this question must be answered in the negative. The respondent has shown no other means of producing income other than by the providing of legal services which is clearly the practice of law. Were the respondent to cease the providing of such services, then it would cease to exist as an income producing enterprise. The nature of the corporate business is such that it must be deemed to be engaged in the unauthorized practice of law with or without the examples of lay control . . . .

*Id.*

We quoted this analysis with approval in *Consolidated*

*Business* and today reaffirm the principle that only attorneys

licensed to practice law in Florida are authorized to act like a law

firm by advertising and selling the legal services of lawyers to the

public unless authorized by our rules.[2] Therefore, we readily

conclude that the nature of TIKD's business is such that it cannot

---

2. While we reaffirm the test outlined in *Consolidated Business* for determining what conduct constitutes the practice of law, we also note that this Court can authorize nonlawyer organizations to profit from the marketing of legal services—and has done so. *See infra* note 3.

be deemed as anything other than engaged in the unauthorized practice of law. As in *Consolidated Business*, TIKD exercises a degree of control over the attorneys it contracts with and the services they provide. TIKD screens all traffic tickets and selects which matters, and correspondingly which legal issues, get assigned to an attorney, as well as the timing of that assignment. TIKD's Terms of Service, not a licensed attorney, designate when an attorney-client relationship is initiated. The fee paid to each attorney is set and collected by TIKD, and the contract TIKD enters into with each attorney requires that the attorney provide legal services in accordance with the "TIKD Guidelines," which "describe the Attorney's responsibilities in providing Services to each [driver]."

Further, just like *Consolidated Business and Legal Forms*, TIKD has no means of producing income except through the provision of legal services—i.e., the representation of clients in a civil or criminal county court proceeding. That is, TIKD is in the business of selling legal services to the public. If it stopped contracting with attorneys, TIKD could not legally represent drivers in court proceedings, and its business would cease to exist.

More recently, we also addressed a similar business model in *Florida Bar re Advisory Opinion—Medicaid Planning Activities by Nonlawyers*, 183 So. 3d 276. There, nonlawyer Medicaid planning companies advertised legal services to the public, accepted members of the public as clients, and employed attorneys to provide the legal services for which the planning companies collected a fee. We determined that "unless the client establishes an independent attorney-client relationship with the attorney, payment from the client is directly to the attorney, and the initial determination that the particular legal document or Medicaid planning strategy is appropriate for the client given the client's particular factual circumstances is the determination of the attorney, then the company would be engaged in the unlicensed practice of law." *Id.* at 284 (quoting committee's opinion with approval). TIKD is engaged in the unlicensed practice of law under this test. Although TIKD's customers ultimately appear to establish an independent attorney-client relationship with one of TIKD's contractually retained lawyers, the other two factors are clearly not met.

We are convinced that our precedent in this area is sound given "the inherent danger of the [unregulated] intervention of lay

persons or organizations in the attorney-client relationship," *Consolidated Business*, 386 So. 2d at 801. Many of the dangers inherent in this type of intervention have already been addressed, as we explained how the ethical standards governing lawyers and law firms would apply to prohibit a law firm from dealing with legal clients (and their money) in the same way that TIKD does. The bottom line is that "[a]n attorney in dealings with his client must exercise a much higher standard of good faith than is required in ordinary business dealings or arm's length transactions." *Brigham v. Brigham*, 11 So. 3d 374, 386 (Fla. 3d DCA 2009). Were we to abandon these higher standards by allowing nonlawyer entities unburdened by them to profit from the commoditization of legal services—through the unregulated marketing and sale of a lawyer's time—it would be difficult, if not impossible, to logically defend constraining the income potential of law firms by regulating their dealings with legal clients.

Ideally, these regulations would be unnecessary. They are, after all, designed to enforce high standards of conduct that would naturally flow, without regulation, from a professional culture in which attorneys are routinely inculcated with classic virtues such

as courage, truthfulness, diligence, humility, and an internalized ethic that places fidelity to just action, client loyalty, and support for the institutions that make freedom under the rule of law possible above raw financial gain. We will certainly not jettison these ideals by sanctioning the unregulated commoditization of legal services—a paradigm shift that would put corporations governed solely by the profit motive between lawyers and their clients.[3]

---

3. We fully acknowledge that TIKD appears to have found a profitable business niche that capitalizes on an unusually high rate of traffic citation dismissals, resulting in a very "good deal" for most of the corporation's legal clients. We also acknowledge that Mr. Riley appears to run that business well and would presumably continue to do so—unless the anomalies that cause the high dismissal rate in those jurisdictions where his algorithm predicts a profit margin are corrected. It could be argued, therefore, that TIKD in some ways increases affordable access to our justice system. However, irrespective of any benefits arguably created by TIKD's unique, and perhaps temporary, niche, we cannot address the access to justice problem by allowing nonlawyer corporations to engage in conduct that, under this Court's sound precedent, constitutes the practice of law.

We recognize that advances in technology have allowed for greater access to the legal system through readily available legal forms, which represent the commoditization of legal work products that at one time were only readily accessed by hiring lawyers. Although continuing advances in technology could offer similar opportunities, those issues should be explored through this Court's rulemaking process—*see* R. Regulating Fla. Bar 1-12.1—where

Two final points merit mention. First, the referee in this case also determined that TIKD is simply paying for an attorney on behalf of a driver and that Bar Rules 4-1.8(f) and 4-5.4(d) authorize such payments by third parties. Bar Rules 4-1.8(f) and 4-5.4(d) authorize an attorney to accept payment for services from a third-party if the client gives informed consent, there is no interference with the attorney's professional judgment, and information related to the representation is protected. The two rules, as well as the rest of the Rules of Professional Conduct, define what conduct attorneys may engage in and do not establish the boundary between what is or is not the practice of law. Further, the two rules are not even implicated under the facts of this case. TIKD designates a portion of the fee it collects from drivers for the payment of the attorney it retains on the driver's behalf. That is, TIKD does not use third-party funds to pay the attorney, but instead uses the driver's own

---

differentiation is possible and where all ramifications can be fully explored with all interested parties. *Cf. In re Amends. to Rules Regulating the Fla. Bar—Subchapter 4-7 (Law. Referral Servs.)*, 238 So. 3d 164, 165 (Fla. 2018) (amending Bar Rule 4-7.22 to authorize and regulate nonlawyer "Qualified Providers" that receive a monetary or other benefit for the referral of prospective clients to lawyers or law firms).

funds, essentially holding the designated portion of the collected fee in trust for the benefit of the driver.

Finally, TIKD contends that it plainly discloses its nonlawyer status to the public on its website and in its Terms of Service, and that the Bar has produced no evidence of harm to the public. However, TIKD's disclosure of its nonlawyer status to the public does not permit it to do what its status as a nonlawyer prohibits it from doing. *See* § 454.23 (Attorneys at Law; Penalties), Fla. Stat. (2020). There is also no requirement in cases involving the unlicensed or unauthorized practice of law that the Bar produce evidence of actual harm to the public; rather, the potential for such harm is sufficient. *See Moses*, 380 So. 2d at 417. The inherent conflict that arises when a nonlawyer either derives income from or exercises a degree of control over the provision of legal services presents a substantial risk that the public will be exposed to and harmed by "incompetent, unethical, or irresponsible representation." *Id.*

## CONCLUSION

Accordingly, the referee's recommendation is disapproved. Respondents, TIKD Services, LLC, a foreign limited liability

- 19 -

company, and Christopher Riley, individually and as founder of TIKD Services, LLC, are hereby permanently and perpetually enjoined from engaging in the acts complained of, as well as any other acts constituting the unauthorized practice of law in the State of Florida.

The Bar has requested that the costs of this proceeding be taxed against TIKD.  *See* R. Regulating Fla. Bar 10-7.1(d)(2).  The Court reserves ruling on the request until the Bar files an affidavit of costs.

It is so ordered.

LABARGA and GROSSHANS, JJ., concur.
CANADY, C.J., concurs in result with an opinion.
COURIEL, J., dissents with an opinion, in which POLSTON and MUÑIZ, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., concurring in result.

I agree that our precedents regarding the unauthorized practice of law support the Bar's position in this case.  I therefore concur in enjoining the Respondents from the acts complained of and other acts constituting the unauthorized practice of law.  In my view, any reexamination of the policy judgments reflected in our

precedents on this subject should be undertaken in the context of rule proceedings related to proposed amendments to the Rules Regulating the Florida Bar.

COURIEL, J., dissenting.

TIKD formulated no legal strategy. It gathered no evidence. It filed no court papers. It made no court appearances, no arguments to a judge or jury. Other than in explaining its offerings on its website, it answered no questions. It did not, because it could not, promise its customers that their communications would be privileged. In short, if you had hired TIKD to solve your legal problem and received only what the company offered—without the services of the member of The Florida Bar it helped you find—you probably would have wanted your money back.

That is because TIKD offered not legal services, but a business proposition: hire a lawyer we introduce, at a fee we set, and you will not bear the risk that the lawyer's services, or indeed your ticket, will cost you more than our fee. Offering that bargain does not constitute the practice of law, and thus cannot have constituted the unauthorized practice of law. Because today's decision reaches well beyond our constitutional mandate to "regulate the admission of

- 21 -

persons to the practice of law and the discipline of persons admitted[,]" art. V, § 15, Fla. Const., and into the business arrangements of people trying to solve their legal problems, I respectfully dissent.

## I

While it is true that we review a referee's entry of summary judgment *de novo,* majority op. at 5, it is nevertheless worth pausing to acknowledge a few of the facts found by the referee in this matter.

First, the referee found facts about TIKD's business model. Reduced to its fundamentals, TIKD "provide[d] a technology platform and financial guarantee for drivers who have received a traffic ticket." Report of Referee at 6. The technology platform was familiar to anybody with a smartphone: create an account, read (if you like) the company's terms of service,[4] visit (if you like) a link containing answers to "frequently asked questions," then click in

---

4. Those terms state, in bold text, that the agreement forms no attorney-client relationship between TIKD and the customer, and that TIKD is not a law firm. ROA at 86. Additionally, and importantly, they state that TIKD will not provide services in connection with criminal and serious infractions. ROA at 87.

agreement if you decide to proceed. The financial guarantee was perhaps less familiar,[5] but not complicated. TIKD offered its customers a degree of certainty about the financial impact of defending a traffic ticket. Customers paid more than zero, but no more than TIKD's fee, which it set based on its assessment of what was likely to happen. TIKD thus bought the upside potential of a positive financial outcome (when the ticket was resolved for less than what the customer was charged) and bore the downside risk of loss (when it was not, including when financial penalties and points were assessed). TIKD charged no fee to potential customers whose tickets it declined to match with an attorney. If TIKD did, in fact, make a match, it calculated its fee without discussion or negotiation with the customer.

---

5. Less familiar, that is, to those of us who are not financial professionals. Those who are might see in TIKD's product more than a passing resemblance to a hedge. *See Hedge, Black's Law Dictionary* (11th ed. 2019) ("To use two compensating or offsetting transactions to ensure a position of breaking even; esp., to make advance arrangements to safeguard oneself from loss on an investment, speculation, or bet, as when a buyer of commodities insures against unfavorable price changes by buying in advance at a fixed rate for later delivery."). The Bar does not, at least in this case, argue that it would be improper for a lawyer to offer such a financial bargain.

Second, setting aside the majority's conclusion that, as a matter of law, TIKD's advertisements constituted legal advice—to which we will come later—the referee found that, as a matter of fact, TIKD did not give legal advice. *See* Report of Referee at 6 ("In the process of deciding whether to accept a ticket, TIKD does not give the driver any legal advice or tell the driver about available defenses or the likelihood of a fine."); *id.* at 7 ("TIKD does not give legal advice or provide legal representation to ticketed drivers."). From the "frequently asked questions" section of its website, where today's majority finds impermissible attorney advertising, the referee quoted as follows:

> **Why should I choose to use TIKD?**
>
> TIKD provides a simple, cost-effective option for you to take action on your traffic ticket. Remember, we are not a law firm and we do not provide legal advice. We're number crunchers and technology lovers and we're here to offer you a new way to handle your traffic ticket.
>
> **Can't I hire a lawyer to do the same thing for me?**
>
> You sure can! And we encourage you to do the research and make an informed choice on what's best for you and your individual case. . . .
>
> **Can I talk to the lawyer who will handle my case?**

Absolutely. Your lawyer is YOUR lawyer. Once we have reviewed and verified your traffic ticket you will be provided with your lawyer's contact information. You can contact your lawyer directly and TIKD does not participate in your relationship with your lawyer.

**Do I have to pay my lawyer separately?**

No. A portion of what you pay to TIKD will go directly to your lawyer. The amount you pay to TIKD is all you will ever have to pay.

*Id.* at 10. TIKD did not, for example, participate in attorney-client communications over which a customer could plausibly assert the privilege; that is, communications in anticipation of litigation, in which advice tailored to the client's particular case presumably would have occurred. *See id.* at 8 ("Drivers communicate directly and confidentially with their attorneys, not through TIKD."). TIKD expressly advised potential customers that it was "not an attorney and does not provide any legal advice . . . ALL LEGAL MATTERS ARE HANDLED BY INDEPENDENT LICENSED ATTORNEYS HIRED ON YOUR BEHALF. TIKD WILL NOT PROVIDE YOU WITH ANY LEGAL ADVICE OR DISCUSS THE LEGAL ASPECTS OF YOUR CASE WITH YOU." *Id.* at 9. In sum, nobody claims, nor is there any evidence, that TIKD gave any customer individualized legal advice about his or her ticket or case; that anybody mistakenly

thought TIKD was a law firm; or that TIKD directed or interfered with the customer's attorney's legal work.

Third, and again leaving aside the status of this conclusion as a legal matter, the referee found that TIKD's customers did in fact enter into independent relationships with the attorneys matched individually to their cases. Having determined that a ticket met its criteria, TIKD would pass the driver's contact information and ticket to a licensed Florida attorney, who was free to accept or decline the opportunity to work for TIKD's customer, at a rate of compensation set by TIKD. If the attorney accepted, his or her representation of TIKD's customer would be governed by an engagement letter negotiated between the two of them, without any involvement by TIKD. The customer, meanwhile, was free to decline TIKD's proposed match for any reason. If the attorney declined, TIKD might send the customer's information to another candidate; if there were no takers, TIKD gave the driver a full refund, and off he or she went to find a lawyer the old-fashioned way. Report of Referee at 7. Where there was a match, however, attorney and client worked and communicated directly together, with no participation by TIKD—which, crucially, had no control over how

- 26 -

the legal services were rendered, and no participation in the defense of the ticket. At the end of the day, if the ticket was dismissed, TIKD kept its fee; if a fine was assessed, TIKD paid it, whether it was more or less than its fee; and if points were assessed, TIKD gave the customer a full refund. *Id.* at 8.

Fourth, and finally, the Bar does not allege, and provided the referee no evidence, that any customer complained about or was harmed by TIKD's work. The record contains no evidence of any complaints to the Bar about any of the independent lawyers to whom TIKD's customers were introduced.

The Bar's complaint against TIKD alleged two violations amounting to the unauthorized practice of law: first, that TIKD advertised in a fashion that would lead a reasonable lay person to believe TIKD was qualified to offer legal services to the public; and second, that TIKD in fact offered legal services through members of The Florida Bar in a way that "violate[d] the letter and spirit" of our cases. The referee disagreed on both counts.

## II

## A

As this Court noted in *Florida Bar v. Moses*, 380 So. 2d 412, 417 (Fla. 1980), "[t]he single most important concern in the Court's defining and regulating the practice of law is the protection of the public from incompetent, unethical, or irresponsible representation."

Here, the record contains no evidence that the public received any incompetent, unethical, or irresponsible representation due to TIKD's business. The lawyers to whom TIKD introduced its users were all members of the Florida Bar, subject to its rules and to its (and our) discipline. We have been directed to no alleged malpractice, or even dissatisfaction, involving lawyers matched with their clients by TIKD. We therefore cannot conclude, on this record, that the public needed the Bar's protection from TIKD, or that its operations even once had a negative effect on the administration of justice. *But see Fla. Bar v. Neiman*, 816 So. 2d 587, 596 (Fla. 2002) ("[D]efining the practice of law must be considered in the context of our obligation to protect the public . . . . [T]he major purpose for prohibiting the unlicensed practice of law is to protect the

consuming public from being advised and represented in legal matters by unqualified persons who may put the consuming public's interests at risk."); *Fla. Bar v. Schramek*, 616 So. 2d 979, 984 (Fla. 1993) (finding that it was necessary to enjoin a man and his company from publishing "kits" used for seeking legal relief and assisting debtors in bankruptcy because this constituted the actual practice of law which was in fact detrimental to the public).

**B**

Today's majority winds up protecting something else: the traditional way people find, or fail to find, satisfactory counsel for traffic tickets, and the business interests that have come to rely on the way things have generally been. The majority finds no "cases or rules authorizing a comparable bifurcation of responsibilities between lawyers and nonlawyers with respect to the provision of legal services." Majority op. at 12. That presumes, incorrectly, that it is up to us to authorize how people in a free market bargain with lawyers and nonlawyers to address their legal problems. If we have such authority, it is not given to us by our constitution, which says merely that we "regulate the admission of persons to the practice of law and the discipline of persons admitted." Art. V, § 15, Fla.

Const.  That mandate cannot be read to include a plenary power to regulate the business models of lawyers or their firms, to say nothing of nonlawyers and their enterprises.

TIKD's business model required it to accept tickets that could likely be resolved at a cost of production (that is, the amount it would pay to counsel, plus its overhead) lower than the fee the customer was willing to pay.  Nothing about that calculation would be different if TIKD was run by an attorney—because, after all, it is a calculation, followed by an investment of money, and not legal advice followed by the defense of a case.

TIKD, the Bar says, cannot produce income without lawyers practicing law.  That is also true of parties who provide litigation finance,[6] who do not themselves give legal advice or do other legal

---

6.  *See* Paul Sullivan, *Pandemic is Expected to Bring More Lawsuits, and More Backers*, New York Times, June 19, 2020 https://www.nytimes.com/2020/06/19/your-money/lawsuits-litigation-finance-coronavirus.html (explaining that litigation financing companies are "nonrecourse financing" arrangements, "meaning if the company or lawyers lose the case, they don't owe the investors anything," which allows law firms and companies to minimize risk while still having access to working capital); Connie Loizos, *This Young Litigation Finance Startup Just Secured $100 Million to Chase Cases it Thinks Will Win*, Tech Crunch, Sept. 18, 2019, https://techcrunch.com/2019/09/17/this-young-litigation-finance-startup-just-secured-100-million-to-go-after-cases-it-

work.  It is true of insurers who hire lawyers for their covered

customers.  *See* R. Regulating Fla. Bar 4-1.8(f), 4-5.4(d).[7]  It is true

of court reporters, people who prepare trial graphics, and indeed an

entire economy incident and complementary to the practice of law

---

thinks-are-winners/ (describing a start-up litigation financing company and stating that litigation financing is, "[i]n a nutshell . . . fund[ing] plaintiffs and law firms in cases where it looks like there will be a winning ruling"); Jacob Gershman, *Lawsuit Funding, Long Hidden in the Shadows, Faces Calls for More Sunlight*, The Wall Street Journal, Mar. 21, 2018 8:00 AM, https://www.wsj.com/articles/lawsuit-funding-long-hidden-in-the-shadows-faces-calls-for-more-sunlight-1521633600 (reporting that as of December 31, 2017, the top four litigation financing funds raised a total of $1.2 billion); Sara Randazzo, *Litigation Funding Moves into Mainstream*, The Wall Street Journal, Aug. 4, 2016 3:20 PM, https://www.wsj.com/articles/litigation-funding-moves-into-mainstream-1470338402 (describing the increasing availability of litigation funding to investors other than large hedge funds, including individual "accredited investors" as that term is defined by the U.S. Securities and Exchange Commission); Mattathias Schwartz, *Should You be Allowed to Invest in a Lawsuit?*, New York Times, Oct. 22, 2015, https://www.nytimes.com/2015/10/25/magazine/should-you-be-allowed-to-invest-in-a-lawsuit.html (describing the historical and modern use of litigation financing and reporting that one of the larger funds, formerly known as IMF Bentham and now known as Omni Bridgeway, had as of 2015 a portfolio of 39 cases with a value of over $2 billion).

7. Though it cites them, the majority reassures us these rules "are not even implicated under the facts of this case."  Majority op. at 19.  And while well that thankfully may be, it is not because any logical principle limits the majority's conclusion from affecting those rules.

that we have neither the constitutional authority nor the capacity to regulate.

## C

We have not purported to have that authority in our cases. We did not do so in *State ex rel. Florida Bar v. Sperry*, 140 So. 2d 587 (Fla. 1962) *vacated on other grounds by* 373 U.S. 379 (1963). There, we prohibited a man not licensed to practice law in Florida from, among other things, holding himself out to the public as a patent attorney; rendering legal opinions; preparing, drafting and construing documents; and "otherwise engaging in the practice of law." *Id.* at 596. As we said there:

> The reason for prohibiting the practice of law by those who have not been examined and found qualified to practice is frequently misunderstood. It is not done to aid or protect the members of the legal profession either in creating or maintaining a monopoly or closed shop. It is done to protect the public from being advised and represented in legal matters by unqualified persons over whom the judicial department can exercise little, if any, control in the matter of infractions of the code of conduct which, in the public interest, lawyers are bound to observe.

*Id.* at 595. TIKD, of course, did not advise or represent in legal matters any of its customers, who received those legal services from

duly licensed Florida attorneys, subject at all times to our discipline.

Nor is the majority's decision today compelled by *Florida Bar v. Consolidated Business & Legal Forms, Inc.*, 386 So. 2d 797 (Fla. 1980). In that case, we considered a company that was expressly "in the business of offering legal services through members of The Florida Bar who [we]re its full time employees." *Id.* at 798. There as here, the officers and stockholders of the company were "non-lawyers with no legal training," but those nonlawyers "supervise[d] and control[led] the day to day business of the corporation" as it advised and performed legal services for clients. *Id.* The company, through its nonlawyer employees, limited the amount of client conference time per individual case, promulgated legal forms to be used as part of the legal services rendered, and had access to the files and work product generated by its lawyer employees on behalf of its customers. *Id.* at 799. Further, the company terminated its lawyer employees at will, holding on to client files when it did so, and not notifying clients when their matters were transferred to new lawyers. Most importantly, the referee in that matter found that the company's practices "resulted in injury or inadequate

representation of [its] clients," several of which the referee specifically identified as having been prejudiced. *Id.* at 800.

On those very different facts, we concluded that the business in question was engaged in the unauthorized practice of law, and found it illustrated "the inherent danger of the intervention of lay persons or organizations in the attorney-client relationship." *Id.* at 801. We have been solicitous of that relationship, and rightfully so. *See Fla. Bar re Advisory Op.—Medicaid Planning Activities by Nonlawyers*, 183 So. 3d 276 (Fla. 2015) (finding that nonlawyers were impermissibly practicing law when they drafted personal service contracts, prepared and executed qualified income trusts, and gave legal advice about the implementation of Florida law to obtain Medicaid benefits). But TIKD did not exercise similar control over anybody's attorney-client relationship, direct the way legal services were rendered, or control any lawyer's legal advice.

Nor have we been given evidence that TIKD's actions harmed anybody. This is in stark contrast to the documented harm that occurred to clients in both *Medicaid Planning Activities by Nonlawyers* and *Consolidated Business & Legal Forms, Inc. See Medicaid Planning Activities by Nonlawyers*, 183 So. 3d at 285

("Testimony described the type of harm caused by nonlawyer Medicaid planners which includes denial of Medicaid eligibility, exploitation, catastrophic or severe tax liability, and the purchase of inappropriate financial products threatening or destroying clients' life savings."); *see also Consol. Bus. & Legal Forms, Inc.*, 386 So. 2d at 800 (approving referee report finding that company's actions "resulted in injury or inadequate representation of [its] clients"). Tellingly, in both of those cases, the documented harm was directly caused by nonlawyers engaging in substantive legal work for their clients.

## D

Next, we come to the majority's decision that "TIKD advertises the legal services that are the core of its business model directly to the public and thereby directly solicits drivers with legal problems." Majority op. at 8. There is no dispute that TIKD advertised directly to the public. And yet it advertised not its legal services or the legal services of any particular lawyer, but the financial bargain and attorney introduction described on its website.[8]  *See* Report of

---

8.  While the record contains evidence of no such thing, the majority fears "TIKD could routinely miss critical deadlines that

- 35 -

Referee at 10 (quoting language about TIKD's services from its "Frequently Asked Questions" page on its website); *see also* ROA at 181 (screenshot of TIKD's former website describing "What TIKD Does").

The parties to the communication matter, because "regardless of a putative client's subjective beliefs, there can be no attorney-client relationship when the client does not consult with the attorney, especially when there is no contact between them." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1282 (11th Cir. 2004) (citing *Fla. Bar v. Beach*, 675 So. 2d 106 (Fla. 1996)). TIKD's advertisements were non-attorney communications, subject to the prohibitions on misleading advertisement generally applicable in Florida. *See* §§ 817.41, 817.44, Fla. Stat. (2020).

---

substantially impair the legal rights of its clients" or "fail in its contractual obligation to pay fines owed, resulting in a client's loss of driving privileges or other legal sanctions." Majority op. at 8-9. TIKD might also abscond with its customers' money, leaving nothing to pay the state if and when fines come due. *Id.* at 9. Worst of all, "because TIKD is not a lawyer, this Court would be powerless to act for the protection of the public." *Id.* Even as monsters under the bed go, these vanish with particular dispatch. This Court is not powerless to act where there has been a breach of contract and is not confined to remedying only those injuries to people's rights and interests committed by lawyers.

So, too, does the content of the communication matter. If what TIKD's website contains—a list of options, not specifically addressed to any client, about certain legally permissible responses to a traffic ticket—constitutes legal advice, then so does Florida's Uniform Traffic Citation, which itself lists "options."[9] To hold that so generalized a communication constitutes advice strains the word beyond its generally accepted meaning, which, especially as applied to lawyers, generally connotes learned and informed counsel.[10] It is strange indeed that we have seized upon a company's having told consumers that they have options to put it out of business.

---

9. The Florida Uniform Traffic Citation promulgated by the Florida Department of Highway Safety and Motor Vehicles gives the recipient the option to (1) pay the fine, (2) contest the citation, or (3) take a driver improvement course. If the driver elects to take the driver improvement course, there is a reduction in the applicable fine. *See* Fla. Dep't of Highway Safety & Motor Vehicles, *Traffic Citations*, flhsmv.gov/traffic-citations/ (last visited July 6, 2021).

10. Advice is "guidance offered by one person, esp. a lawyer, to another; professional counsel." *Advice, Black's Law Dictionary* (11th ed. 2019); *see also Advice, Oxford English Dictionary* (2d ed. 1989) ("guidance or recommendations concerning prudent future action, typically given by someone regarded as knowledgeable or authoritative").

## III

The practice of law is not, or at least it is not just, the manner and means of competition among lawyers for clients' work. Nor is it synonymous with any particular method for determining who gets access to legal services and at what price. We do not protect the profession or the public when we equate the practice of law to these things. I fear we have done that in this case, and in so doing, reached beyond our constitutional grasp.

POLSTON and MUÑIZ, JJ., concur.

Original Proceeding – The Florida Bar

Joshua E. Doyle, Executive Director, Kellie D. Scott, Chair, Standing Committee on Unlicensed Practice of Law, William A. Spillias, Unlicensed Practice of Law Counsel, and Algeisa Maria Vazquez, Bar Counsel, The Florida Bar, Tallahassee, Florida; and Chris W. Altenbernd of Banker Lopez Gassler P.A., Tampa, Florida,

    for Complainant

Christopher M. Kise of Foley & Lardner LLP, Tallahassee, Florida; and Ramón A. Abadin of Ramón A. Abadin, P.A., Coral Gables, Florida,

    for Respondents

Gregg D. Thomas and James J. McGuire of Thomas & Locicero PL, Tampa, Florida,

for Amici Curiae Gold & Associates, P.A. d/b/a The Ticket Clinic, Joseph Lorusso, P.A., The Law Offices of Lou Arslanian, Steven Bell, Esq., and The Law Offices of H. A. Rodriguez

Raoul G. Cantero of White & Case LLP, Miami, Florida,

for Amici Curiae Responsive Law and Center for Public Interest Law